**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF VIRGINIA**
**Norfolk Division**

**CARS UNLIMITED II, INC.,**
**Plaintiff,**

**v.** **Civil Action No. 2:06cv305**

**NATIONAL MOTOR COMPANY, INC.,**
**Defendant.**

---

**NATIONAL MOTOR COMPANY, INC.,**
**Counterclaim Plaintiff,**

**v.**

**CARS UNLIMITED II, INC.,**
**Counterclaim Defendant,**
**and**

**DONNIE ANTOINE HYDER,**
**Counterclaim Defendant,**
**and**

**SHARON J. KEE,**
**Counterclaim Defendant.**

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This matter is before the court following a two-day bench trial on the plaintiff's, Cars Unlimited II, Inc. ("Cars Unlimited"), breach of contract claim and counterclaim plaintiff's, National Motor Company, Inc. ("National"), claims for breach of contract, fraud, conspiracy, and declaratory judgment. After weighing the credibility of the witnesses, reviewing the documentary record, and analyzing the applicable law, the court now makes its findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

## I.  FINDINGS OF FACT

In late 2004, Cars Unlimited, a North Carolina used car dealership, and National, a Virginia company providing small business financing/automobile floor plan loans, entered into an oral contract whereby National provided Cars Unlimited a $150,000 loan to purchase used cars for resale at Cars Unlimited's dealership; Cars Unlimited was required to repay the principal along with $50,000 in interest on August 1, 2005.  On January 21, 2005, subsequent to National disbursing a portion of the agreed upon funds, the parties entered into a written security agreement and promissory note memorializing their oral contract.  Cars Unlimited utilized the loan as intended by the parties, and ultimately repaid National the outstanding principal and interest.  Although National collected the entire $200,000 it was owed, it appears that Cars Unlimited had difficulty repaying the debt as many of the vehicles sold by Cars Unlimited, a "buy here, pay here" establishment, were paid for by customers over a period of years through on-site financing.  Accordingly, the only way Cars Unlimited could amass a $200,000 lump sum seven months after having access to National's funds was to sell its accounts receivable to third party finance companies; however, due to the fact that most of Cars Unlimited's customers had poor credit, Cars Unlimited was only able to sell a fraction of its paper, and the money received for such fraction was highly discounted due to the customers' poor credit ratings.  Apparently stemming from Cars Unlimited's difficulty satisfying its financial obligations to National, as the contract period was winding down, National, unsure if it would enter into a new loan agreement for the following year, provided Cars Unlimited a letter of recommendation directed to "prospective lenders" to aid Cars Unlimited in securing alternative financing.

In November and December of 2005, Cars Unlimited, represented by its Vice President Donnie Hyder ("Hyder"), negotiated a second financing agreement with National; the second

agreement differed from the first in four primary respects. First, the loan amount and interest doubled to $300,000 and $100,000, respectively; in exchange for such loan, National received a security interest in all of Cars Unlimited's vehicles and consumer credit contracts. Second, National chose not to provide Cars Unlimited unrestricted use of the $300,000 for the contract period, setting up the financing similar to a line of credit rather than a straight loan. As a result, Cars Unlimited could initially access up to $300,000 in December and January, but thereafter was required to pay back portions of the principal to National when down payments or periodic payments were received from customers. As Cars Unlimited paid down the outstanding principal through such interim payments, it was able to re-borrow funds to purchase additional vehicles, subject to contractual limitations; Cars Unlimited could access such additional funds: "As long as Borrower is not OUT OF TRUST and is not in any material BREACH of any agreement and Creditor determines that the COLLATERAL is secure" (Joint Exh.1, at NM286). National's president acknowledged that the second deal was structured like a revolving line of credit and that Cars Unlimited needed access to such funds for the entire contract period in order to build a bank of receivables sufficient to generate the large lump sum due at the conclusion of the loan period. Third, the new agreement included "floor plan fees," which required Cars Unlimited to pay National a set fee per thirty days that a financed car sat on Cars Unlimited's lot. A $110 fee per thirty days applied to cars with a dealer purchase price of $4,000 and under, whereas a $250 fee per thirty days applied to cars with a cost of over $4,000. The contract clearly states that the floor plan fees "do not go toward the reduction of the loan; they are additional fees." Fourth, although the second agreement was negotiated in a manner similar to the first in that oral negotiations proceeded the written contract, unlike the first agreement, National did not recognize that an enforceable contract existed at the conclusion of oral

negotiations, and National insisted that a written contract be finalized prior to releasing any money to Cars Unlimited to fund the acquisition of vehicles.

The written financing agreement dated November 28, 2005, and signed in early December, includes provisions whereby Cars Unlimited "covenants that it has the absolute right to grant a security interest in or Assign all the Collateral," that such collateral is "free from any prior liens, security interests or Other encumbrances or interests of any other party," and that Cars Unlimited "warrants that no other Financing statement covering any of the Collateral is on file in any public office" (Joint Exh.1, at NM284); National drafted such provisions.  At the time the contract was executed, two other entities, First South Bank ("First South") and Advanced Business Funding ("ABF"), both had financing statements on file with the North Carolina Secretary of State; however, National was unaware of at least the ABF financing statement as National failed to perform a financing statement search prior to executing the second contract with Cars Unlimited.[1]  National's president, Jerome Greenberg ("Greenberg") acknowledges that it was National's internal error that resulted in its failure to discover the ABF financing statement as he instructed Steve Matthews ("Matthews"), National's operations manager, to perform a search and Matthews failed to do so.[2]  In February of 2006, during contract performance, Matthews performed a financing statement search and discovered the two priority

---

[1] The First South financing statement was in place prior to the parties' first contract and National both filed and later terminated a financing statement in conjunction with such contract, suggesting that National would have been aware of such statement.  The ABF statement was not filed until after the termination of the parties' first deal; however, National plainly should have conducted a search prior to the second deal as National had recently provided Cars Unlimited a recommendation letter for the sole purpose of helping it secure alternate financing.

[2] Matthews' testimony conflicts with Greenberg on several points, including the facts surrounding the lack of a financing statement search; Matthews does not recall being instructed to conduct a search, contending that a search was not performed because National was relying on Hyder's word that no prior statements existed.

financing statements; however, National never demanded that such statements be terminated or that Cars Unlimited cease utilizing ABF to fund vehicles.  Furthermore, National continued to re-loan funds to Cars Unlimited subsequent to its discovery of the priority financing statements.[3]

The process through which Cars Unlimited sold its vehicles as a "buy here, pay here" establishment and manner that National sought to perfect its security interest in its collateral are key to the resolution of the instant litigation.  When Cars Unlimited purchased a vehicle, most commonly from an automobile auction, National would supply the funds and Cars Unlimited or the auction house would thereafter deliver the raw title to National; thus, while a vehicle was sitting on Cars Unlimited's lot, National held the title.  Thereafter, when a vehicle was sold to a customer through dealer financing, the typical manner cars were sold, National would return the raw title to Cars Unlimited who would apply for a new title in the car purchaser's name, encumbered by a lien in favor of Cars Unlimited.  The newly issued title listed Cars Unlimited as the lienholder because the consumer credit contract ("CCC") signed by the customer was a contract between the customer and Cars Unlimited and all future payments were due to, and collected by, Cars Unlimited.  Because National was not listed as a lienholder on the title, in order to perfect its security interest in the receivable resulting from the sale, National required Cars Unlimited to provide it with physical possession of both the newly issued title and the original CCC.  National's demand was supported by a contractual clause mandating that Cars Unlimited deliver "documents which [National] believes are appropriate to create, preserve, perfect or validate its security interest in the Collateral" (Joint Exh.1, at NM284).  Unbeknownst to National, Cars Unlimited's customers signed <u>three original</u> CCC's when purchasing a vehicle,

---

[3] The prior financing statements were associated with much smaller loans than National's, as the First South line appears to have been $15,000 and the ABF floor plan loan $50,000.

one was provided to National, one retained by Cars Unlimited, and one given to the customer. Cars Unlimited explains such practice as merely a product of Cars Unlimited's primitive copier which did not accept paper large enough to provide a full size duplicate of the CCC. Although Cars Unlimited's practice of executing triplicate originals may have merely been an unsophisticated business practice, the result of such practice, anticipated or unanticipated by Cars Unlimited, is that National was receiving a document without the legal power that National believed it possessed as two additional CCCs with original signatures were in existence and not in National's possession.

In addition to the prior financing statements and Cars Unlimited's failure to provide National with all original CCC's, during February and March of 2006, Cars Unlimited "double funded" nine cars by obtaining concurrent financing for such vehicles from both ABF and National. One of the nine cars, a 2002 GMC Yukon, was later sold to Selma Hyder, Donnie Hyder's wife, for $14,275, the same price that Cars Unlimited purchased the vehicle for at auction; it is, however, unclear whether Cars Unlimited ever collected more than $13,000 from Mrs. Hyder. Additionally, none of the $13,000 collected by Cars Unlimited from Mrs. Hyder near the end of March was remitted to National as Cars Unlimited contends it was merely holding such funds while Mrs. Hyder used such vehicle for an "extended test-drive" lasting until June or July when she finally decided to purchase the vehicle. Such claim squarely conflicts with the bill of sale, dated March 23, 2006, indicating a purchase price of $14,275 and a cash payment received in the same amount (National Exh.66). Furthermore, whether or not the sale was finalized, it is undisputed that National and ABF each provided Cars Unlimited $14,275 in March to purchase such vehicle, and that Cars Unlimited failed to repay either when it received the $13,000 and provided Mrs. Hyder full use of the vehicle; instead, the $13,000 was deposited

in Cars Unlimited's business checking account, National was never repaid, and ABF was not repaid until late June.[4] As to the remaining eight cars that were double funded, the parties agree that ABF was fully repaid on seven of such cars by a check dated March 7, 2006 (Cars Exh.104, at ABF 42-44). The status of the ABF loan on the eighth car is unclear from the inconclusive exhibit provided to the court; however, National fails to prove that ABF was not fully repaid on such vehicle in March as Cars Unlimited contends, and even if such car remained doubled funded, only $4,000 was borrowed from National for the purchase of such vehicle.

On April 10, 2006, the contractual relationship suffered what can only be characterized as a total breakdown, with apparent breaches by both parties that potentially qualify as material. Cars Unlimited, having recently purchased a 2000 Mercedes S500 for approximately $26,000, applied for funding from National but National, on Greenberg's instructions, refused such request; the sole justification offered for such denial was that the price of the car was too high. Greenberg testified at trial that he had repeatedly instructed Hyder, both during contract negotiations and during performance, that National would not finance high value cars and that the average price of the vehicles funded should be $2,500; notably absent from the written contract was any clause regarding such requirement. Greenberg's testimony reveals that he took a "my money, my rules" approach to the business relationship, permitting him, in his mind, to verbally dictate requirements not included in the written contract. After the dispute over the Mercedes arose, Matthews attempted to bridge the gap between Greenberg and Hyder, suggesting either that Hyder pay a $600 floor planning fee for the Mercedes, or rather than purchasing the Mercedes, Cars Unlimited purchase several lower value cars more in line with

[4] Cars Unlimited's contention that the $13,000 was merely a down-payment of which only one-third was due to National conflicts with the paid-in-full status on the bill of sale.

National's expectations. The proposed $600 floor planning fee, characterized by Cars Unlimited as an attempt to extort money, well exceeded the maximum monthly floor plan fee in the contract, which was $250 for vehicles priced over $4,000. Cars Unlimited therefore refused to pay the proposed $600 fee and likewise could not accept Matthews' second proposal as Cars Unlimited had already purchased the $26,000 Mercedes in anticipation of National funding such car pursuant to the contract.[5] In response to National's refusal to fund the Mercedes, Cars Unlimited stopped payment on a $27,560 Cars Unlimited business check to National representing the payoff of several other vehicles; Cars Unlimited's bank statements reveal that Cars Unlimited could not cover both the check for the Mercedes and the $27,560 check to National. National immediately objected to such action as Cars Unlimited was contractually required to remit such funds to National as National had already released the titles for such vehicles to Cars Unlimited. The parties thereafter exchanged several letters alleging the other was in material breach of the contract.

In May and June of 2006, subsequent to the contractual breakdown sparked by the dispute

surrounding the Mercedes, Cars Unlimited unilaterally liquidated a large block of its accounts receivable, collecting approximately $200,000 from third-party finance companies in exchange for the sale of the receivables associated with approximately seventy-eight vehicles sold by Cars Unlimited during the course of the second contract with National. Cars Unlimited completed

[5] It is readily apparent that National's refusal to fund the Mercedes was not prompted by any of Cars Unlimited's prior breaches, material or otherwise. Rather, National both sought to enforce terms not in the contract and sought to maximize the amount of money it could extract from Cars Unlimited. Obviously a floor plan fee more than double the contractually agreed upon fee would increase National's revenue, as would Cars Unlimited forgoing the purchase of one high value vehicle for the purchase of five lower value vehicles, as five vehicles purchased for $5,000 each would amount to total monthly floor plan fees of $1,250.

such liquidation by obtaining duplicate titles from the North Carolina DMV; Cars Unlimited was able to obtain such duplicate titles as it was the listed lienholder on the previously issued titles that National had in its physical possession. In order to obtain the duplicates, Hyder completed seventy-eight North Carolina DMV form MVR-4, indicating in the "Affidavit of First Lienholder" section that the prior titles were "Lost while in my possession." Because such form required a notary seal, Hyder contacted counterclaim defendant Sharon Kee ("Kee"), a notary and former Cars Unlimited employee. When Kee first arrived to perform the notarizations, Hyder attempted to barter with her, asking Kee to notarize the documents in exchange for a credit on a vehicle payment apparently owed to Cars Unlimited. Kee rejected such offer, threatening to leave unless she was paid for her time; Hyder yielded to her demand, agreeing to a $50 cash payment. After notarizing the DMV forms, Kee agreed to leave behind her notary stamp at Hyder's request.[6] Kee's uncontroverted testimony establishes that she did not know that her actions would harm National or anyone else, she just wanted to get paid. Subsequent to obtaining the duplicate titles, Cars Unlimited was able to sell its receivables to third-party finance companies because, unbeknownst to National, Cars Unlimited had in its possession an original CCC, creating the appearance that Cars Unlimited had the authority to sell such receivables. National was entirely unaware of Cars Unlimited's actions related to the liquidation

[6] Although not directly relevant to the resolution of the legal claims at issue, in order to illustrate the questionable decisions made by the parties as well as shed some light on the difficult credibility determinations undertaken by the court, it should be noted that Hyder is being criminally investigated in North Carolina regarding the acquisition of the duplicate titles. Additionally, Hyder is a convicted felon and was apparently involved in out of trust sales of numerous vehicles as part of a prior business venture. Furthermore, there is evidence before the court indicating that Hyder forged signatures in order to falsely notarize documents. On the other side, National's president and operations manager offered conflicting testimony regarding the structure of the second loan as a revolving line of credit and the facts surrounding the financing statement search. Additionally, National at times either requested or demanded performance outside the scope of the agreed upon contractual terms.

of the receivables until after such transactions were completed. Cars Unlimited failed to remit to National any of the funds obtained from the sale of the receivables.

## II. CONCLUSIONS OF LAW

Cars Unlimited and National both allege that the other was the first to materially breach the parties' second contract. Additionally, National alleges that Cars Unlimited and Hyder both defrauded National and that Cars Unlimited was a party to a business conspiracy against National with former employee Kee. As discussed below, the court finds that Cars Unlimited was the only party to materially breach the contract; Cars Unlimited's breach of contract claim is therefore **DENIED** and judgment is **GRANTED** in favor of National on its breach of contract counterclaim. The court **DENIES** National's fraud and business conspiracy claims.

### A. Breach of Contract

Cars Unlimited initiated the instant lawsuit alleging that National's refusal to fund the $26,000 Mercedes on April 10, 2006, was a material breach of the contract. National's refusal to fund such vehicle when nearly three months remained in the contract period was in fact material to the contract as National's president recognized that Cars Unlimited needed access to such money throughout the entire contract period in order to build a bank of receivables sufficient to cover the large lump sum due at the end of the contract term. The court further acknowledges that it is possible that Cars Unlimited may not have known that it had previously committed acts constituting a material breach as of April 10, 2006, and therefore may have believed that National committed the first material breach and that Cars Unlimited was therefore justified in stopping payment on the $27,560 check. However, notwithstanding Cars Unlimited's claimed belief that it was justified in taking such action, Cars Unlimited is unable to avoid the reality that it committed a material breach prior to April 10, 2006, and that such breach suspended

National's obligation to provide funds for the purchase any additional vehicles at any price.

A breach of contract occurs if a party to a contract "fail[s], without legal excuse, to perform any promise which forms the whole or part of a contract." Clevert v. Jeff W. Soden, Inc., 241 Va. 108, 111, 400 S.E.2d 181, 183 (1991) (quoting Black's Law Dictionary 188 (6th ed. 1990)). Under Virginia law, the first breaching party may still enforce a contract if such breach was not material, that is, if it "did not go to the 'root of the contract' but only to a minor part of the consideration." Horton v. Horton, 254 Va. 111, 115, 487 S.E.2d 200, 203 (1997). A material breach, however, prevents the breaching party from enforcing the contract and excuses the other party from performing its contractual obligations. Id. at 116, 487 S.E.2d at 204. Whether a breach qualifies as "material" is not driven by the amount of damages incurred as a result of the breach, but rather, materiality is defined by the impact the breach has on the purpose of the contract. Id. Thus, a breach qualifies as material when "the evidence establishes that the breach was so central to the parties' agreement that it defeated an essential purpose of the contract." Id.; see Reiner v. Carilion Health System, No. 7:06cv114, 2006 WL 2009038, at *2 (W.D. Va. July 17, 2006) (unpublished) ("Under Virginia law, the party who commits the first breach of a contract cannot enforce the contract, as long as the breach goes to the 'root of the contract.'"); RW Power Partners, L.P. v. Virginia Elec. and Power Co., 899 F. Supp. 1490, 1496 (E.D. Va. 1995) (quoting Farnsworth on Contracts, Material Breach and Suspension § 8.16) (explaining that, under Virginia law, a material breach "is one that goes to the root of the contract. In other words, a material breach 'deprive[s] the injured party of the benefit that the party justifiably expected from the exchange'"). Although a material breach may not always permit a party to justify terminating the contract as fairness may dictate that the breaching party be afforded an opportunity to cure such breach, a material breach certainly "justifies the injured

party in suspending performance." RW Power Partners, 899 F. Supp. at 1496; see Farnsworth on Contracts, Total Breach and Termination § 8.18 ("Although a material breach justifies the injured party in exercising a right to self-help by suspending performance, it does not necessarily justify the injured party in exercising such a right by terminating the contract.").

Turning to the instant facts, after carefully reviewing the testimony and documentary evidence, the court concludes that Cars Unlimited committed four breaches of the contract prior to April 10, 2006, one of which qualifies as material. Addressing the breaches the court considers to be non-material, first, the contract indicates both that the collateral assigned to National is free of prior security interests and that no other financing statements covering such collateral are on file in any public office. Both such provisions were breached as First South and ABF had prior financing statements on file in North Carolina and Cars Unlimited did not have an absolute right to assign the collateral to National. Although prior financing statements can plainly be material to a lender's interest in protecting its collateral, here, National either knew, or should have known, about the First South financing statement prior to executing the second contract as such statement was in existence prior to the first contract for which National both filed and later terminated a financing statement covering Cars Unlimited's assets; such events call into question National's credibility regarding its claim that it was unaware of such statement when the second contract was executed.[7] Likewise, National should have discovered the ABF financing statement in conjunction with executing the second contract as Greenberg ordered a financing statement search but National's internal error resulted in the non-occurrence of such

[7] Hyder also provided National balance sheets in conjunction with the first contract that reported "D.L. Floorplan" and "First South Line" as liabilities and Greenberg admits that such items would have raised a red flag if he, rather than Matthews, had reviewed such statements. Whether or not Matthews had the sophistication to recognize the implications of such liabilities, Cars Unlimited was plainly not concealing the existence of its other lenders.

search.[8] Additionally, in February of 2006, when National contends to have first discovered both priority financing statements, National had little reaction other than having a conversation with Hyder, and National never asked Cars Unlimited to pay off the other lenders or terminate the priority financing statements. Instead, National appears to have remained comfortable with its collateral as National continued to loan substantial sums of money to Cars Unlimited subsequent to such "discovery." The court therefore finds that the existence of the prior financing statements did not go to "the root of the contract" as National's drive to make money caused it to either willingly take on such risk when entering into the contract or offer little reaction to the relatively small dollar amounts of collateral tied to such statements after they were discovered. Likewise, although National's president ordered a financing statement search, National willingly went forward with the second contract without first confirming the results.

Second, Cars Unlimited breached the written contract by obtaining concurrent financing for nine vehicles from both ABF and National as such action plainly encumbered National's collateral in breach of the written contract. Although the concurrent funding, similar to the prior financing statements, had the potential to qualify as a material breach, Cars Unlimited quickly cured its breach with respect to either seven or eight of the nine vehicles double funded and did so prior to discovery by National. Accordingly, because ABF was apparently paid off on all double funded vehicles other than the 2002 Yukon prior to April 10, 2006, even if such breach was material, it was timely cured and National therefore cannot rely on such events as justification for refusal to fund the Mercedes.

[8] National's claim that it was dissuaded from conducting a search due to the contractual clause warranting that no prior statements existed is weakened by the fact that not only did National author such warranty, but Greenberg plainly did not rely upon it when ordering a search.

Third, with respect to both the double funding of the 2002 Yukon and the fact that the sale of such vehicle to Hyder's wife occurred in a unorthodox manner apparently outside the ordinary course of business, Cars Unlimited's actions represent a failure, without excuse, to perform a promise within the contract and therefore qualify as a breach. Tellingly, not only did the Yukon remain double funded as of April 10, 2006, but Cars Unlimited collected, but did not remit to National, a $13,000 payment for such vehicle while Mrs. Hyder was taking the Yukon for an "extended test drive" that lasted several months. If the sale of such vehicle occurred in March, as reflected on the bill of sale, Cars Unlimited breached the contract by not transferring the $14,275 cash purchase price to National. If the sale occurred in June or July, as argued by Cars Unlimited, the contract likewise appears breached as of April 10, 2006, as Mrs. Hyder's extended use of the car without any payment to National appears to qualify as an offer to sell the vehicle outside the ordinary course of business; the fact that the Yukon was sold at cost enhances such argument. Notwithstanding such plain breach, the court concludes that a breach with respect to a single vehicle in the course of National financing over a hundred vehicles prior to the contractual breakdown is insufficient to rise to the level of defeating an essential purpose of the contract. The handling of the 2002 Yukon, therefore, does not qualify as a material breach.

Unlike the non-material breaches set forth above, Cars Unlimited's practice of executing triplicate original CCCs and providing only one of the three originals to National was a material breach of the contract. Although, as discussed infra, the court concludes that National failed to prove that Cars Unlimited executed three original CCCs as an artifice to defraud, whether such practice was intentional or merely unsophisticated, it nevertheless resulted in National's inability to perfect its security interest in any vehicle financed through Cars Unlimited, therefore going to the root of the contract and depriving National of the benefit that it justifiably expected from the

contract.  The testimony and documentary evidence reveals that Cars Unlimited was contractually required to produce documents requested by National "to create, preserve, perfect, or validate its security interest in the Collateral" (Joint Exh.1, at NM284), and that National believed to have protected its interest in Cars Unlimited's accounts receivable by taking physical possession of a vehicle's original title and what National believed to have been the lone original CCC.  However, although National believed to have perfected its interest in such paper, because two other original CCCs existed, National was exposed to the potential of having hundreds of thousands of dollars of its collateral liquidated without notice.  National's potential exposure was demonstrated when Cars Unlimited obtained duplicate titles and used the original CCCs in its possession to liquidate over $200,000 in National's collateral to third-party discount finance companies.  Unlike the other breaches, which violated the contract without defeating an essential purpose of it, Cars Unlimited's practice of delivering only one of three originals CCCs to National fully defeated the purpose of the loan and contractual relationship from National's point of view; tellingly, the second contract was restructured in order to reduce the exposure faced by National and ensure that National's collateral would be secure during the contract period–as it turns out, National's collateral was never secure.  Although it is unfortunate that Cars Unlimited may[9] have unwittingly materially breached the contract, Cars Unlimited freely consented to the contractual terms and must be held accountable for its material breach.  See United States v. Kelley, 145 F.R.D. 432, 436 (E.D. Mich. 1993) (concluding that defendant's compliance with standard EPA regulations did not excuse its failure to follow the additional environmental requirements set forth in the consent judgment and that it was "irrelevant that [defendant's]

---

[9] As previously mentioned, Hyder's credibility is suspect for numerous reasons and the court leaves room for the distinct possibility that Hyder fully understood the ramifications of the triplicate original CCCs.

mistake was unintended [or] that the Plaintiffs cannot show bad faith" as the defendant violated the clearly written contractual terms).

A substantial portion of the parties' arguments with respect to the breach of contract claim have been devoted to the debate involving the timing of National's knowledge regarding the breaches occurring prior to April 10, 2006. Such extensive discourse results from the fact that National did not refuse to fund the 2000 Mercedes due to the triplicate CCCs, or any other breach mentioned above, but rather, the only justification offered for National's refusal to fund such vehicle was that National was not interested in funding high priced vehicles. Although National's president appears to believe that because he held the purse strings he could verbally dictate legally binding contract terms, National's refusal to recognize the November 2005 oral negotiations as a final agreement and its early December letters documenting the lack of finality and the requirement that all terms be finalized in a written contract prevent National from now relying on alleged terms of the prior oral negotiations. See Virginia Elec. and Power Co. v. Northern Virginia Regional Park Authority, 270 Va. 309, 316, 618 S.E.2d 323, 326-27 (2005) (quoting Godwin v. Kerns, 178 Va. 447, 451, 17 S.E.2d 410, 412 (1941)) ("[I]n controversies between two parties to a contract, parol evidence of prior or contemporaneous oral negotiations or stipulations is inadmissible to vary, contradict, add to, or explain the terms of a complete, unambiguous, unconditional, written instrument.") (alteration in original).[10] Thus, it is apparent to the court that as of April 10, 2006, National failed to articulate a valid justification for its

---

[10] National's closing argument contends that because the contract failed to mention an average vehicle purchase price the contract qualifies as "ambiguous," permitting the court to consider parol evidence. The court rejects such claim as the failure to mention an otherwise unnecessary term does not equate with ambiguity; if a contractual limit on the price of vehicles was so important to National, it should have included such term in the written contract. See Virginia Elec. and Power Co., 270 Va. at 316, 618 S.E.2d at 326-27 (indicating that prior negotiations cannot be relied upon to add to the terms of a final written instrument).

refusal to fund the Mercedes, and if the actual circumstances were in conformity with the circumstances as National believed them to be, National would have been the first party to materially breach the contract.

Notwithstanding the fact that National was unable to articulate a valid justification for its refusal to fund the Mercedes, National ultimately prevails on the contract dispute based on two legal theories.  First, regardless of its lack of knowledge, National was permitted to suspend performance based upon Cars Unlimited's prior material breach as it is a well-established precept of contract law that ignorance of a material breach does not preclude a party from thereafter relying on such breach as justification for its failure to perform.  See College Point Boat Corp. v. United States, 267 U.S. 12, 15 (1925) ("A party to a contract who is sued for its breach may ordinarily defend on the ground that there existed, at the time, a legal excuse for nonperformance by him, although he was then ignorant of the fact"); Western Auto Supply Co. v. Sullivan, 210 F.2d 36, 39-40 (8th Cir. 1954) ("[I]t seems to be generally accepted by wellconsidered [sic] decisions that a party to a contract may defend on the ground that there existed at the time a legal excuse for non-performance by him although he was ignorant of that fact at the time of the breach."); Geo. Byers Sons, Inc. v. East Europe Import Export, Inc., 488 F. Supp. 574, 587 (D. Md. 1980) ("That the [plaintiff] may have been ignorant of the[] material breaches until some later date does not alter the conclusion that plaintiff is not liable on [defendant's] counterclaim for breach of contract."); Christopher Village, LP v. United States, 53 Fed. Cl. 182, 189 (2002) ("The[] facts establish that plaintiffs committed a prior material breach of the HUD contracts, even though the U.S. government was not aware of the facts at the time of the foreclosure at issue in this litigation.  It is well-settled that [a] prior material breach excuses a subsequent breach by the government."); see also Leahey v. Federal Exp. Corp., 685 F. Supp.

127, 128 (E.D. Va. 1988) ("In Virginia, it has long been established that just cause for termination may include facts and circumstances not known to the employer."); Mega Constr. Co. v. United States, 29 Fed. Cl. 396, 421-22 (1993) ("Any extant reasons supporting a default termination are sufficient to sustain the default, even if not known or discovered until after the decision to terminate for default is made."). Thus, National was legally justified in suspending performance of its contractual duties even before it was aware of the legal justification for doing so; although such rule may frustrate plaintiffs, as the first party to materially breach the contract, Cars Unlimited must live with the legal consequences of its material breach.

Second, in addition to the fact that Cars Unlimited was the first party to commit a material breach, Cars Unlimited's actions also resulted in the failure of a condition precedent to National's continued performance as after the initial $300,000 was loaned to Cars Unlimited, National was only required to re-loan funds: "As long as Borrower is not OUT OF TRUST and is not in any material BREACH of any agreement and Creditor determines that the COLLATERAL is secure" (Joint Exh.1, at NM286). Thus, as dictated by the plain terms of the contract, National was relieved of its responsibility to re-loan money if Cars Unlimited was in material and uncured breach of the contract. See Countryside Orthopaedics, P.C. v. Peyton, 261 Va. 142, 155, 541 S.E.2d 279, 286 (2001) (recognizing that plaintiff is unable to enforce the contract whether his failure to perform "is viewed as a first material breach or as a failure to fulfill the condition precedent . . . [requiring] compliance in all material respects with every material term with this Agreement"); Restatement (Second) of Contracts § 237 cmt.a ("[O]ne party's material failure of performance has the effect of the non-occurrence of a condition of the other party's remaining duties . . . even though that other party does not know of the failure."). Although Cars Unlimited contends that the contract requires that notice be provided in the event

of a material breach, National failed to provide notice not because it regarded the triplicate CCCs as immaterial, but because National was unaware of Cars Unlimited's material breach. Furthermore, although the contract contains a section titled "DEFAULT RIGHTS" that anticipates National providing notice of default prior to invoking such provision's protections, National does not rely on such provision to justify its cessation of performance; rather, National relies upon the contract clause governing re-loaning money which fails to include a similar notice requirement. Accordingly, irrespective of whether notice was provided, National was not contractually obligated to re-loan money to Cars Unlimited, thereby increasing National's exposure, because as of April 10, 2006, Cars Unlimited was in material breach.[11]

As discussed in more detail above, the court concludes that Cars Unlimited materially breached the written contract prior to April 10, 2006, thereby relieving National of its obligation to loan further funds to Cars Unlimited. Because National's actions were legally justified, Cars Unlimited committed a second material breach when it stopped payment on the $27,560 check to National and National followed the proper procedures for noticing Cars Unlimited's second material breach. Because Cars Unlimited failed to timely cure the noticed material breach, both pursuant to principles of contract law and the provisions in the contract governing material breaches, National was permitted to cease all performance and demand immediate payment of the outstanding principal plus associated interest. As Cars Unlimited failed to remit such funds either at that time or at the contract's scheduled termination date of July 1, 2006, National has

[11] National likewise appears justified in ceasing to re-loan money due to the fact that Cars Unlimited was "out of trust" on April 10, 2006, as a result of its handling of the 2002 Yukon. The Yukon's bill of sale reports a completed sale for $14,275 on March 23, 2006, and reports that such price was paid in full; it is undisputed that Mrs. Hyder paid Cars Unlimited a minimum of $13,000 at such time. Although Cars Unlimited collected such payment and National had funded the vehicle for over $14,000, Cars Unlimited failed to remit any proceeds from such sale to National during the two-and-half weeks prior to the contractual breakdown.

successfully proven damages associated with the contractual breaches in the following amounts: $290,368.46 in principal, $100,000 in associated interest as provided in the contract, and $26,270 in outstanding floor-plan fees as of the end of the contract period.[12] The damages due to National are reduced by $37,750 based on money obtained from vehicles already returned to National, resulting in a total damage award of: $388,888.46. As stated on the record, because National has prevailed on its breach of contract claim, the court will now entertain a motion from National regarding the award of reasonable attorney's fees as contemplated by the contract.[13]

**B. Fraud**

Count Two of National's third amended counterclaim ("counterclaim") alleges that Cars Unlimited and Hyder defrauded National both through the affirmative misrepresentations in the contract regarding the lack of prior liens, security interests, or other encumbrances and through the failure to disclose the practice of executing triplicate original CCCs. In order to prevail on its fraud claim, National must prove by clear and convincing evidence: "(1) a false representation, (2) of a material fact, (3) made intentionally and knowingly, (4) with intent to mislead, (5) reliance by the party mislead, and (6) resulting damage to the party misled." Hitachi Credit America Corp. v. Signet Bank, 166 F.3d 614, 628 (4th Cir. 1999) (quoting Evaluation Research Corp. v. Alequin, 247 Va. 143, 148, 439 S.E.2d 387, 390 (1994)). Alternatively, National may establish actual fraud based on the intentional concealment or omission of material

---

[12] The court rejects National's attempt to include floor plan fees accumulated subsequent to the contract period as National offers no justification for the continuation of such fees. Additionally, although not relevant based upon the court's ruling, the court notes that Cars Unlimited failed to prove its damages and therefore could not have recovered more than nominal damages.

[13] The court requests that the parties include in their briefs regarding attorney's fees their positions regarding the appropriate pre and post judgment interest rates.

facts.  Van Deusen v. Snead, 247 Va. 324, 328, 441 S.E.2d 207, 209 (1994).  Although silence

does not constitute fraud absent a duty to disclose, "[c]oncealment of a material fact by one who

knows that the other party is acting upon the assumption that the fact does not exist constitutes

actionable fraud."  Hitachi, 166 F.3d at 629 (quoting Allen Realty Corp. v. Holbert, 227 Va. 441,

450, 318 S.E.2d 592, 597 (1984)).  Both words and conduct can amount to concealment and such

acts are punishable as fraud because concealment "always involves deliberate nondisclosure

designed to prevent another from learning the truth."  Id. (emphasis added).  Thus, Virginia

courts require "evidence of a knowing and a deliberate decision not to disclose a material fact."

Norris v. Mitchell, 255 Va. 235, 240-41, 495 S.E.2d 809, 812 (1998); see Bank of Montreal v.

Signet Bank, 193 F.3d 818, 829 (4th Cir. 1999) (recognizing that a duty to disclose may arise if

"the fact is material and the one concealing has superior knowledge and knows the other is

acting upon the assumption that the fact does not exist").

Here, National fails to advance sufficient evidence to establish actual fraud or fraud

through concealment as alleged in the counterclaim.  First, with respect to the alleged fraud at

contract formation, although the contract plainly contained false representations regarding prior

encumbrances, National fails to establish that such statements were made with an intent to

mislead.  Although Cars Unlimited was plainly responsible for reviewing the contract to ensure

its accuracy prior to signing it, National offer no evidence in support of its conjecture that Cars

Unlimited knowingly deceived National.  On the contrary, the evidence suggests that National

authored the clauses regarding prior encumbrances and Cars Unlimited reluctantly agreed to sign

the written contract in order to finalize what it believed to have been a prior oral contract.

Additionally, Cars Unlimited previously provided National with balance sheets indicating a line

of credit and a floor plan with entities other than National and although such balance sheets fail

to affirmatively establish that prior financing statements were on file, they indicate that Cars Unlimited was not attempting to conceal from National its prior financing arrangements. Furthermore, even if Cars Unlimited signed the contract knowing that it contained false statements, National fails to establish that its reliance on such statements was reasonable as National plainly had the ability to discover the falsity of the highlighted clauses merely by conducting a financing statement search; tellingly, National's president ordered such search but internal mistakes resulted in the search never being conducted. See Hitachi, 166 F.3d at 629 ("The touchstone of reasonableness is prudent investigation."); Horner v. Ahern, 207 Va. 860, 863-64, 153 S.E.2d 216, 219 (1967) (quoting Costello v. Larsen, 182 Va. 567, 571-72, 29 S.E.2d 856, 858 (1944)) ("[I]f false representations are made regarding matters of fact, and the means of knowledge are at hand and equally available to both parties, and the party, instead of resorting to them, sees fit to trust himself in the hands of one whose interest it is to mislead him, the law, in general, will leave him where he has been placed by his own imprudent confidence."). National's attempt to establish that its reliance was reasonable because it was diverted from conducting a search fails as Cars Unlimited's reluctant willingness to sign the contract containing the diversion clause authored by National is insufficient to establish the requisite diversion; additionally, the evidence reveals that National was not diverted as Greenberg stated under oath that he ordered Matthews to conduct a search but Matthews mistakenly failed to do so. Thus, National both fails to establish an intentional fraudulent statement and reasonable reliance.[14]

[14] National also fails to establish any resulting damages from prior financing statements as National fails to advance any evidence indicating that First South or ABF have made any claims on Cars Unlimited's assets that are superior to National's. The mere existence of such financing statements tied to much smaller dollar amounts than the over $400,000 at issue in this dispute is plainly a breach of the contract, but is insufficient to establish the elements of fraud.

Second, considering the fraud allegation with respect to the triplicate CCCs, National fails to establish intentional concealment. As discussed above in the breach of contract analysis, Cars Unlimited contends that the practice of executing triplicate original CCCs was an unsophisticated business practice prompted by Cars Unlimited's primitive copier; such claim was largely corroborated by Kee, a former employee of Cars Unlimited who testified at a preliminary hearing, testified at trial, and submitted several declarations to the court. Although Kee's testimony at trial was slightly at odds with her prior sworn representations, she offered little clarification regarding the change in her recollection as well as an unclear description of her newly formed claims regarding whether Cars Unlimited's copier was capable of copying paper larger than 8 ½ x 11. After considering <u>all</u> of Kee's sworn statements and weighing her credibility, the court concludes that National fails to establish that Cars Unlimited executed triplicate original contracts <u>with the intent to defraud</u> as National failed to provide reliable evidence indicating that Cars Unlimited made a deliberate decision to conceal such practice from National knowing that National was relying on its non-existence.[15] The court recognizes the undisputed fact that Cars Unlimited ultimately utilized the original CCCs in its possession to National's extreme detriment after the contractual relationship suffered a total breakdown; however, National fails to advance any evidence whatsoever that such liquidation was contemplated prior to execution of the contract, or prior to April 10, 2006. Accordingly, after considering all of the evidence and weighing the credibility of the witnesses, the court concludes that National fails to establish that the triplicate CCCs were created with the intent to defraud;

[15] It bears noting that National was suing Kee as a counterclaim defendant yet Kee appears to have met with National's attorneys on several occasions, was prepped for her testimony by National's attorneys, and acted more akin to a witness for National than an adverse party. Although Kee's trial testimony improves National's position, it falls short of establishing an intent to defraud or knowing concealment by Cars Unlimited or Hyder.

rather, the triplicate CCCs appear to have become an after-the-fact convenient tool utilized by Cars Unlimited in liquidating National's collateral.[16]

**C. Business Conspiracy**

Count Four of National's counterclaim alleges that Cars Unlimited, acting through its president Paul Zimmerman ("Zimmerman"), and Hyder, conspired with Kee, a former employee of Cars Unlimited, to induce National to enter into the instant contract and damage National through a scheme involving creating triplicate original CCCs, obtaining duplicate titles, and liquidating National's collateral. In order to establish statutory business conspiracy, a plaintiff must prove: (1) that there was a conspiracy to harm the plaintiff; (2) that the defendant acted with "legal malice" toward plaintiff; and (3) that the defendant's conspiratorial actions caused plaintiff to suffer damages. Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 108 F.3d 522, 526 (4th Cir. 1997). Although Virginia law no longer requires the conspirators' primary and overriding purpose to be to damage the plaintiff, in order to prove the first prong of the test set forth above, the plaintiff must establish that the conspirators shared a

---

[16] The court likewise rejects National's contention that Cars Unlimited and Hyder defrauded National through the acquisition of duplicate titles from the North Carolina DMV, utilization of such titles to liquidate over $200,000 of National's collateral, and by secretly selling cars out of trust subsequent to the contractual breakdown. Such claims fail as: (1) notwithstanding the fact that the court permitted National to file a third amended counterclaim over six months after the instant litigation was initiated, National's counterclaim fails to allege fraud regarding such acts; (2) liquidation of receivables and vehicles funded by National was in direct contravention of the contract terms and Virginia law generally does not recognize fraud as an independent tort when the challenged activity is directly reducible to the breach of a duty arising from the contract. See Richmond Metro. Authority v. McDevitt Street Bovis, Inc., 256 Va. 553, 559, 507 S.E.2d 344, 347 (1998) (rejecting plaintiff's actual fraud claim because "each particular misrepresentation by [defendant] related to a duty or an obligation that was specifically required by the . . . Contract") (emphasis added); and (3) National failed to prove the elements of fraud with respect to such claims as Cars Unlimited did not make false representations relied upon by National, or deliberately fail to disclose such actions while inducing National to act in a certain manner; rather, Cars Unlimited secretly performed such acts subsequent to the complete breakdown of the parties' relationship.

common design.  See Ruttenberg v. Jones, 464 F. Supp. 2d 536, 551 (E.D. Va. 2006)

(highlighting the need for a common design and recognizing that the mere fact that each actor

played a role in the events does not establish a unity of purpose).

Here, considering the alleged conspiracy at contract formulation, the record is devoid of

evidence suggesting that at the time the contract was entered Sharon Kee was anything more

than a secretary/office employee of Cars Unlimited who followed Hyder's orders.  There is no

evidence of any meeting, agreement, or discussion between Kee and Hyder regarding the

contract with National.  Furthermore, at the time the contract was entered, Kee was an employee

of Cars Unlimited and it is well established that "a single entity cannot conspire with itself."  Fox

v. Deese, 234 Va. 412, 428, 362 S.E.2d 699, 708 (1987).  Accordingly, National fails to establish

that a conspiracy existed at contract formulation.

Considering the conspiracy alleged regarding the liquidation of National's collateral

subsequent to April 10, 2006, although Kee was no longer an employee of Cars Unlimited and

may qualify as an independent contractor rather than an agent of Cars Unlimited, National fails

to establish a common design between Cars Unlimited and Kee.  Rather, at most National proves

that Kee played a role in the events leading up to the liquidation of National's collateral as Kee

provided a half day of spot work notarizing the seventy-eight duplicate title applications utilized

by Cars Unlimited to liquidate National's collateral.  In exchange for notarizing documents,

Kee's only alleged involvement, Hyder paid Kee $50 in cash.  Not only does National fail to

establish a common design or that Kee was aware of the fact that Hyder intended to use the

notarized documents to National's detriment, but circumstantial evidence and Kee's

uncontroverted testimony establish that Kee never shared a unity of purpose with Hyder or Cars

Unlimited; she merely wanted to get paid.[17] The facts surrounding Kee's involvement with notarizing the duplicate title applications hardly suggest that Kee's performance of a ministerial task in exchange for $50 was somehow part of a common design to liquidate over $200,000 of National's collateral. See Ruttenberg, 464 F. Supp. 2d at 551 (playing a role in the relevant events does not establish the requisite unity of purpose). Accordingly, National's business conspiracy claim fails.

## III. Conclusion

As discussed in more detail above, having reviewed the voluminous exhibits advanced by the parties, the testimony from trial and pre-trial hearings, and after having made credibility determinations with respect to such testimony, the court concludes that Cars Unlimited materially breached the written contract prior to April 10, 2006, and Cars Unlimited committed a second material breach when it stopped payment on the $27,560 check to National. National was justified in declining to re-loan funds to Cars Unlimited based upon the first material breach and was justified in ceasing all performance and invoking the contractual remedies for a material breach after notifying Cars Unlimited of the second material breach. Cars Unlimited is therefore required to repay National the outstanding loan principal, associated interest, and outstanding floor plan fees, and judgment is hereby **GRANTED** in favor of National on its breach of contract counterclaim in the amount of **$388,888.46**. Additionally, as provided by the contract, National seeks interest on the judgment and reasonable attorney's fees and the court will entertain a motion from National regarding the same. The court **DENIES** Cars Unlimited's breach of

---

[17] The court recognizes that Kee notarized Zimmerman's signature on the duplicate title applications even though she either believed that Hyder was forging Zimmerman's signature or believed that Zimmerman had previously signed such documents outside of her presence. Regardless of Kee's belief and admitted failure to follow the rules regarding notarizations, such failure does not equate with a unity of purpose with Cars Unlimited.

contract claim and National's fraud and business conspiracy counterclaims.

As a result of a finding in National's favor on its breach of contract claim, the court **GRANTS** in part National's claim for declaratory judgment, as National seeks possession of motor vehicles, proceeds from the sale of motor vehicles, and proceeds from the sale of consumer credit contracts relating to the collateral as defined in the contract. Accordingly, as between National and Cars Unlimited, National is entitled to possession of the collateral and proceeds thereof. As to the remaining allegations set forth in the counterclaim, including those against Cars Unlimited and against Dominion Holdings Corp. and Roy Hyder, Jr., additional counterclaim defendants, the court withholds judgment as the court previously bifurcated the resolution of such matters pending the bench trial on whether Cars Unlimited was liable to National for breach of contract, fraud, or business conspiracy. Because the court finds Cars Unlimited liable for breach of contract, a trial on the remaining issues, which pertain largely to National's collection of the judgment, will be scheduled to resolve the remaining issues. Additionally, the court **DENIES** and deems **MOOT** Cars Unlimited and Hyder's motion for a protective order and to quash subpoenas (Dkt. 32), and motion to quash deposition notices (Dkt. 38). Likewise, the court **DENIES** and deems **MOOT** National's motion to compel discovery (Dkt. 55), motion to expedite a discovery hearing (Dkt. 60), and Motion in Limine seeking to prevent Cars Unlimited and Donnie Hyder from presenting certain evidence at trial (Dkt. 100).

The Clerk is **REQUESTED** to send a copy of this Order to counsel of record for all parties, including the additional counterclaim defendants, and to Sharon Kee. Because Kee's involvement in this litigation was limited to the counterclaim count alleging business conspiracy and the court rules in favor of Cars Unlimited and Kee on such count, Sharon Kee is hereby **DISMISSED** as a party to the continuing litigation. To clarify as Kee has proceeded pro se,

Sharon Kee is not responsible for any damages to National Motor and she is dismissed from all further involvement in the pending litigation; Kee should, however, comply with any enforceable subpoenas as she may be called upon to testify regarding the remaining issues in this case. Counsel for the remaining parties are **INSTRUCTED** to contact the court's calendar clerk in order to schedule a trial on the remaining issues.

**IT IS SO ORDERED.**

/s/
Jerome B. Friedman
UNITED STATES DISTRICT JUDGE

Norfolk, Virginia
August 15, 2007